*Summons JBS  SEA106217*

Shaundra Howard
13445 MLK JR WAY SOUTH, UNIT R202
SEATTLE, WA 98178
206-679-9550
Shaundra Howard <shaundra_howard@msn.com>

FILED
LODGED
RECEIVED

MAIL

JAN 06 2022

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON

SHAUNDRA HOWARD,

    Plaintiff,

vs.

KILOLO KIJAKAZI in her official capacity
as Head of the UNITED STATES SOCIAL
SECURITY ADMINISTRATION AND
JOHN DOES 1-10

    Defendants.

Case No. 2:22-cv-00022-RAJ

COMPLAINT FOR DISCRIMINATION AND RETALIATION

JURY TRIAL DEMANDED

Plaintiff, based upon information and belief, state as follows:

## I.   INTRODUCTION

**COMES NOW** the Plaintiff, Shaundra Howard, acting *pro se*, and for causes of action against the

Defendants, complains and alleges as follows:

## II.   PARTIES, JURISDICTION & VENUE

1.    Plaintiff Shaundra Howard resides in Seattle, Washington. The Plaintiff has exhausted all

administrative remedies and performed all conditions precedent to the maintenance of this action and is in all

other respects fully qualified to maintain this action. See attached EEOC Administrative decision referenced

under EEOC No. 550-2019-00553X (formerly 551-2015-00088X) and Agency No. SEA-14-0441-SSA.

2.    Defendant Department of Social Security Administration (hereinafter referred to as

Defendant" or "SSA") is a federal agency under the United States, having its principal office and place of

business located at 26 Federal Plaza/Room 4060 New York, NY 102783.

3.    Defendant Kilolo Kijakazi is the director and official agency head, having her principal office and place of business located at 26 Federal Plaza/Room 4060 New York, NY 102783.

4.    John Does 1-10 are persons and/or companies yet to be identified who may in whole or in part be liable for all or part of the claims set forth herein as may be revealed in discovery or investigation and/or who may be found to be necessary parties to this action.

5.    Jurisdiction is conferred on the court because Plaintiff has fully exhausted her administrative rights by fully participating in an administrative hearing before the EEOC and therefore is entitled to a trial *de novo*. *See* 42 USC 2000e–16(d); 42 USC 2000e–5(f) through (k) and 29 USC 794a. Under the 1991 Civil Rights Act, the time for filing a civil action after a final agency decision or final decision of the Commission has been extended to 90 days. 42 USC 2000e–16(c).

6.    Venue in this court is appropriate pursuant to Title 28, U.S.C. §1391, because the plaintiff is a resident of Washington.

7.    Plaintiff asserts claims in violation of Title VII.

### III.    PROCEDURAL BACKGROUND

8.    On February 27, 2015, Administrative Judge Molly B. Powell issued an Acknowledgment Order. Thereafter, Plaintiff filed several motions to amend the complaint to include additional acts of harassment.  On October 15, 2015, Judge Powell granted Plaintiff's request to add claims related to derogatory names (including CBB or any variation thereof), and having Snickers bars placed on her desk. The order also made clear that any instances of ongoing harassment like or related to what comprises the instant complaint would be included in the instant complaint without further order[1].

---

[1]  Additional claims are set forth in the Statement of Facts and Analysis sections below, pursuant to Judge Molly Powell's Order of October 15, 2015. Judge Powell granted Plaintiff's request to add claims related to derogatory names (including CBB or any variation thereof), and having Snickers bars placed on her desk. The order also made clear that any instances of ongoing harassment like or related to what comprises the instant complaint would be included in the instant complaint without further order[1].

9.     On September 29, 2018, Judge Terrie Brodie issued an order to hold the case in abeyance. The case was subsequently re-opened and assigned to Supervisor Judge Emily K. MacMillin. The case was docketed under EEOC No. 550-2019-00553X.

10.    On October 13, 2021, Judge MacMillin granted the agency's Motion for a Decision without a Hearing. She attached Decision.

## IV.     BACKGROUND AND CLAIMS[1]

11.    This complaint address hostility and reprisal against Ms. Shaundra Howard during her employment with the Social Security Administration over more than five years. The harassment included racial, sexual and reprisal harassment of an African American woman living and working in Seattle, Washington. The harassment was created and shaped by a twisted, group mentality. The decisions made by supervisors Michael Brooks and Kathryn Talley, the group leaders, caused coworkers to isolate and castigate Plaintiff to the point she was forced to stand alone and suffer from psychological issues such as depression and anxiety due to a campaign of harassment by a gang-like behavior.

12.    Supervisors Michael Brooks and Kathryn Talley and coworkers Nancy Kline, Ron Devore, Janice Danek, Donna Skubina, Audrey Roberts and Chris Odom were perpetrators of harassment against Plaintiff. Susan Banks, second line supervisor, Eileen Otti, agency in-house counsel, did nothing to stop it. Supervisors and coworkers were aware of Plaintiff's prior EEO activity.[2] As discussed above, Plaintiff

---

[1] This complaint periodically references deposition testimony and the Report of Investigation prepared during the course of litigation before a contract administrative judge appointed by the defendant. The same is attached hereto and incorporated herein as if fully setforth.

[2] Shaundra Howard (Sex: Female; Race: African-American; prior EEO activity; Age: 42, DOB: 1972; hereafter, Plaintiff) is a GS-06, Legal Assistant, SSA, and ODAR, in Seattle, Washington. She has been in her position for 4 years. Her first-line supervisor is Kathryn Talley, and her second-line supervisor is Susan Banks. Plaintiff claims that management was aware of her sex, race and EEO activity. (Exhibit 10)

Kathryn Talley, (Sex: Female; Race: Asian; aware of Plaintiff's EEO activity; Age: 51, DOB: 1963) is a GS-13, Group Supervisor, SSA, ODAR, in Seattle, Washington, and has been for about 4 years. Ms. Talley is Plaintiff's first-line supervisor. She states that she is aware of Plaintiff's sex, race and prior EEO activity, but is not aware of her age. (Exhibit 11)

Michael Brooks, (Sex: Female; Race: Sex: Female; Race: White-Non-Hispanic; aware of Plaintiff's EEO activity; Ms. Brooks served as Group Supervisor, SSA, ODAR, in Seattle, Washington. Ms. Brooks served as Plaintiff's first-line supervisor from 2013 to 2014 and was named as responsible management official in Plaintiff's prior EEO activity.

engaged in prior protected EEO activity when she filed a prior formal EEO complaint dated June 7, 2012;

through subsequent amendments, Plaintiff alleged that the agency harassed and discriminated against her

based on race (African-American), gender (female) and in reprisal for prior protected EEO activity under Title

VII. Plaintiff also opposed discrimination when she testified in an EEO case involving a coworker, Ms.

Haneefah Mahmood, and provided evidence in an EEO case involving Judge Ilene Sloan. See depositions

attached hereto. According to EEOC Enforcement Guidance, "opposition activity encompasses a broader

range of activity by which an individual opposes any practice made unlawful by the EEO statutes." The

significant professional repercussions Ms. Howard suffered were also based on protected activity. Ms.

Howard has also provided contemporaneous emails detailing racial, gender (including sexual harassment as it

relates to ALJ Keith Allred) and retaliatory harassment. See Supplemental exhibits at pp 47-81. The agency

attempted to undermine the EEO investigative process by launching a so called "investigation" months after

the EEO investigation was completed. Supplemental exhibits at pp 82-87. By this time, Ms. Howard was

being referred to as "CB" and "Crazy Bitch," "CBB," "Crazy Black Bitch" and surveillance and stalking by

Talley and Brooks. See Supplemental exhibits at pp 88-94, 100-103, 106-190 and Exhibit 10 and

---

Susan Banks (Sex: Female; Race: African-American; aware of Plaintiff's EEO activity; Age: 53, DOB: 1961) is a GS-14 Hearing Office Director, SSA, and ODAR, in Seattle, Washington. She has been in here position since 2000. Ms. Banks is Plaintiff's second-line supervisor. She states that she is aware of Plaintiff's sex, race, and prior EEO activity, but is not aware of her age. (Exhibit 12)

**Jon Veen** (Sex: Male; Race: White-Non-Hispanic; aware of Plaintiff's EEO activity; Age: 38. DOB: 1976) is a GS-13, Supervisory Attorney Advisor, SSA, and ODAR, in Seattle, Washington. He has been in his position since September, 2012. Mr. Veen states that Plaintiff is, generally, not in his chain of command, however, he sometimes acts as Hearing Officer Director, in which case he is Plaintiff's second line supervisor. He states that he is aware of Plaintiff's race, sex and EEO activity, but is not aware of her age. (Exhibit 13)

Janice Danek (Sex: Female; Race: Caucasian; aware of Plaintiff's EEO activity; Age: 68, DOB:, 1946) is a GS-6, Legal Assistant/Case Technician, SSA, and ODAR, in Seattle, Washington. She has been in her position for 3 years. She states she is aware of Plaintiff's sex, race, and prior EEO activity. (Exhibit 16)

Ron Devore (Sex: Male; Race: Caucasian; not aware of Plaintiff's EEO activity; Age: 44, DOB: 1970) is a GS-9, Lead Legal Assistant, SSA, and ODAR, in Seattle, Washington. He has been in his position for 11 years. He states that he is aware of Plaintiff's race and sex. He states he became aware of Plaintiff's prior EEO activity on May 19, 2014. (Exhibit 17)

Camilla Johnson (Sex: Female; Race: African-American; aware of Plaintiff's EEO activity; Age: 55, DOB: 1959) is a GS-8, Senior Case Technician, SSA, and ODAR, in Seattle, Washington. She has been in her position for 3 years. She states that she is aware of Plaintiff's race and sex. and is only aware of Plaintiff's prior EEO activity through office rumors. (Exhibit 20)

Supplemental exhibits part 2, part 3, part 4 and part 5.  See also Decl. Shaundra Howard and Decl. Cedric Miller.

## V.    FIRST AND SECOND CLAIMS FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RACIAL DISCRIMINATION

13.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

14.    Ms. Howard was subjected to racial stereotyping, jokes, slurs, insults, affronts and castigated because of her ethnicity. She was referred to as "Crazy Bitch," "Crazy Black Bitch," "CB," and "CBB" by co-workers. See testimony of Plaintiff, who states that Ms. Danek was at her cubicle, a couple feet away from Plaintiff's cubicle, conversing with Ms. Roberts. Ms. Danek referred to her as "CB." She states that when she walked by again, Ms. Danek used the term, "CBB." She states that she made Ms. Banks aware of this. She states that she feels her race and sex are factors because she is an African-American female. Her prior EEO activity is a factor because she has filed numerous complaints. See Exhibits 10, 27-29. Also see Howard Dep at pp 1-41.

15.    Kline was the ring leader for racist, misogynistic slurs hurled at Plaintiff.  She first falsely testified that she did not make such statements. At page 13 of her depositions, she testifies as follows: "Q. Ms. Kline, I'm asking at this point in time – I haven't relegated it to time. I'm asking if you've ever made any derogatory statements or comments about Ms. Howard. A. Probably. Q. And I'd like to know what you have said about her. A. I don't remember with any specificity offhand." At page 14: "Q. Okay. I'm interested in knowing if you've ever made any negative descriptive comments about Ms. Howard. MS. GARCIA: Objection; vague. Q. You may answer. A. No." The attached deposition of Ms. Nancy Kline, a coworker who freely used harassing comments to describe Ms. Howard to coworkers and supervisors, testified at pages 14-22 of her deposition: "Q. Okay. I'm interested in knowing if you've ever made any negative descriptive comments about Ms. Howard. MS. GARCIA: Objection; vague. Q. You may answer. A. No. Q. No, you've never made such comments, huh? A. Huh-uh. Q. Is that "no"? A. "No" on negative comments. Q. Okay. And

have you ever used any terms to describe her? A. Yes. Q. What comments have you made describing Ms. Howard? A. To identify her, not -- Q. Yeah. What comments have you made to identify her? A. She had a nickname. It's not a comment. Q. What nicknames have you used to refer to her? A. "CB." Q. Pardon me? A. "Crazy bitch," "CB." Q. You've used the term "crazy bitch" or "CB" to refer to Ms. Howard? A. Yes." See also Decl. Shaundra Howard and Decl. Cedric Miller.

16.    Ms. Kline also testified that she has not used the term to refer to other employees.  At page 22: "Q. All right. Now, Ms. Kline, have you used that term to describe other people? A. No. Q. All right. So Ms. Howard is the only coworker that you used that term to describe, correct? A. that is the only coworker with that nickname, to my knowledge." Ms. Kline confirms other employees also used similar name calling to refer to Ms. Howard.

17.    Ms. Kline testified that she was not the only employee who referred to Ms. Howard in derogatory ways and her supervisor, Michael Brooks, was aware of it. Dep at pp 27-29. Ms. Kline and her co-workers also referred to Social Security claimants, who were suffering with mental disabilities, in derogatory ways. They used term "crazies" as a way of describing these claimants. Dep at pp 29-35. So when she and co-workers referred to Ms. Howard in derogatory ways she thought it was appropriate for her, Ron Devore, Ms. Skubina and others to refer to Ms. Howard as a crazy bitch.

18.    Ms. Kline remained steadfast, from 2012 through the date of her deposition on July 23, 2014, that she would harass Plaintiff by use of derogatory comments. Ms. Kline first heard derogatory comments used against Plaintiff in 2012. Dep at 42-44.  At page 36 of her deposition, Ms. Kline testified: Q. And so when you refer to Ms. Howard as "crazy bitch," you didn't think there was anything wrong with that term, did you? A. You mean when I called her "CB"? Q. Yes. A. It seemed apropos." Q. Yeah. And it was not only apropos in your mind, but it was a nickname that you gave her. MS. MILLER: Objection; argumentative. Q. Correct? A. Yes."

19.    Ms. Kline denies the use of the "CBB or Crazy Black Bitch." However, Chris Odom, a coworker, confirms her use of the terms: "I'm just wondering, sir, when Ms. Kline used the term "CBB" or

"crazy black bitch," why you didn't feel compelled to stop it. MS. GARCIA: Objection; misstates testimony.

Q. You may answer, sir. A. Those terms were used when it was explained to me what they meant, but I am not

her supervisor. I am not qualified to insist she do anything." See Odom Dep at pp 63 and 64.

     20.    In a back-handed way, Ms. Kline admits she engaged in creating a hostile work environment

of Plaintiff. At page 50: "Q. That, and you used the term "crazy bitch," right? A. Usually when trying to tell

somebody what "CB" stands for. Q. Right. So you'd agree that that term is demeaning, would you not? A. Not

necessarily. Q. You don't think the term "crazy bitch" is a demeaning term? A. It could be. Q. Well, how could

it not be? A. Well, it seems apropos." At page 51: "Q. Is there any way in which the use of the term "crazy

bitch" would not be demeaning? A. Demeaning? I tend to be very logical, and when somebody is kind of

crazy and kind of a bitch, I mean, it makes sense to me. Q. Well --A. It's not derogatory. It just is." At page 52:

"Q. Ms. Kline, you are certainly familiar with the term "hostile work environment," are you not? A. Yes. Q.

Do you believe that the use of the term "crazy bitch" is keeping with your obligation and the obligation of

your coworkers to maintain a hostile-free work environment? MS. GARCIA: Objection; calls for a legal

conclusion. Q. Based on your understanding as a paralegal and as a person who has used the term "hostile

work environment" yourself? A. A crazy bitch creates a hostile work environment, in my opinion. Q. Are you

referring to yourself or someone else? A. Someone else. Q. Oh, okay. So that word is -- you're using to

describe Ms. Howard? A. I'm not supposed to at work, but I'm in a deposition so you're asking me for the

truth. At page 55: "A. I believe that the crazy bitch causes my hostile work environment. I don't know what

Ms. Howard believes." At page 56: "Q. Well, no. You just testified that you believe the crazy bitch is who

caused the hostile work environment. A. Yes. Q. Who are you referring to in that sentence? A. Your client. Q.

Who is my client? A. Shaundra Howard." At page 57:"Q. I just want to be sure I understand your testimony.

In your mind you routinely refer to her as "crazy bitch," right? A. Uh-huh, that's true."  ROI at pp 164-172.

     21.    Mr. Chris Odom was a member of the group of harassers; he testified he was friends with

Kline and he was not in a position to judge her actions: "Q. So you don't think it's wrong for Ms. Kline to

refer to Ms. Howard as a crazy bitch or a crazy black bitch? A. I didn't say that, sir. What I said is it's not my

place to judge anyone else's behavior." He testified, despite 22 years of federal service, he was unaware that he had an obligation to report hostility in the work place. Odom Dep at pp 53-57.

22.    Ms. Banks, Ms. Talley and Ms. Brooks served as Ms. Howard's supervisors. They and the co-workers were aware of Ms. Howard's prior EEO Activity. See ROI at pp 224, 245, 263. 264, 300, 310 and 333. They received reports of the harassment but did nothing to terminate it. ROI at pp 249 and 254. See also Exhibits 10 and 12. Talley testified she was aware Howard had filed a complaint against her friend, Michael Brooks prior to the complaint at issue here. See Talley (December 16, 2016) Dep at pp 67-69.

## VI.    THIRD CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RETALIATORY HARASSMENT DISCRIMINATION

23.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

24.    On January 22, 2014, the Senior Legal Assistant (SLA) glared at Plaintiff, making Plaintiff uncomfortable and forcing Plaintiff to leave the work area.

25.    On Wednesday, January 22, 2014 3:12PM- Plaintiff reported Ron Devore for glaring at her while she sat at my cubicle and making me very uncomfortable. "He stood there across from me and just glared. His glaring made me extremely uncomfortable to the point that I left the work area. I reported the incident to my supervisor, Kathryn Talley. I view this as retaliation and harassment of my previous complaints lodged against Ron Devore." See Exhibit 10, ROI 173-175. According to Ms. Kline, Ron Devore was the one who first began referring to Ms. Howard as "CB" and as a "crazy bitch." See Kline Dep at pp 16-19. However, Devore denies ever using the term; he claims Kline was the first to use the term with Chris Odom. See Devore Dep at pp 18-22; also see Exhibits 17, 25, 26 and ROI pp 183.[1]

---

[1] Plaintiff testified she heard the use of "Crazy Bitch," "Crazy Black Bitch," "CB" and "CBB" used by Devore, Kline, Odom, Danek, Donna Skubina, Audrey Roberts and others. See Kline Dep at pp 19-21 and Exhibit 10. Plaintiff is female, African American and Devore was named in Plaintiff's prior EEO complaint. See Exhibit 10.

26.     On the day in question, Ms. Howard turned around and found him standing behind her cubicle. She states that he continued to stare at her when she made eye contact. She states that this made her so uncomfortable that she had to leave her cubicle. She complained about this to management. However, according to Devore no management official ever questioned him about his conduct in any way: "Q. and as I understand it, no one has ever questioned you about glaring at Ms. Howard; is that correct? A. Yes, that's correct." Devore Dep at pp 31.

27.     Talley became aware of how Devore glared at Plaintiff when Howard sent an email to Talley and Banks. By this time, Banks, Talley and Eileen Otti were aware of the derogatory statements by Howard's co-workers in reference to her race and sexuality. However none of the supervisors terminated the conduct or disciplined any of the employees, including Kline, who were involved in the racist, misogynistic references to Ms. Howard. To excuse Devore's conduct, they claims he tends to stand and wait for people before he speaks with them. However, in the conduct which is the subject of the claim, Devore did nothing to engage Howard. He glared at her and in a mean and intimidating manner. **Devore** states that management has never informed him that any such allegation has ever been made. (Exhibit 17).

### VII.     FOURTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RETALIATORY HARASSMENT DISCRIMINATION

28.     The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

**29.**     From early 2015 until October, 2015, Plaintiff was followed by Talley and Brooks whenever she left her place of employment, Plaintiff would be tracked until she entered the vehicle of her fiancé, Cedric Miller, who typically would wait to pick her up each evening due to the continuing harassment.

**30.**     Ms. Howard testified in her deposition of December 16, 2016, beginning at pp 24: Q. All right. And were there times where you would leave the building and the two of them would follow you outside? MR. LANGKAMER: Objection, leading. A. Yes. Q. Could you describe what happened in that regard, please? A. When I would leave for lunch and also when I would leave for the end of the day, I would actually switched my schedule up, because when I would go for lunch, both of them would be standing right

downstairs, and Kathryn Talley would be blocking the exit door as I would leave, so I would go to the second door. And I always have people waiting for me outside, so I told them about this, so they'd watch how this occurred for months, several months. So at one point I was leaving out the door and Kathryn Talley would just block the one door and then Michael Brooks would block the second door, and my fiancé had to kind of get out the car and start walking, you know, towards the building. So I was kind of like I didn't want any confrontation with them. At that point I thought to myself this is getting ridiculous. So I had already complained to Susan Banks about how they continued to harass me, follow me outside the building. And as of a couple of weeks, Susan Banks sent me an email and said since this is happening outside of the building outside of SSA space, there's nothing she can do about it, nothing that she can do about it, and told me to contact local law enforcement." The shadowing became so intimidating and frequent, Plaintiff was forced to file a formal police report. See also Decl. Shaundra Howard and Decl. Cedric Miller.  Ms. Howard reported the following:

> HOWARD SAYS NEARLY EVERY DAY SINCE FEBRUARY. 2015 AT HER 1300 LUNCH TIME AND AT THE END OF HER WORK DAY AROUND 1530 HRS, THE TWO SUPERVISORS ARE NEAR THE FRONT DOOR OF THE BUILDING ON THE GROUND FLOOR STANDING NEXT TO THE DOOR. HOWARD SAYS AS SHE APPROACHES THE DOOR TO LEAVE THE BUILDING, THE TWO LISTED SUPERVISORS WAIT UNTIL THE LAST POSSIBLE MOMENT AND THEN MOVE OUT OF HOWARD'S WAY, PERMITTING HER EXIT FROM THE BUILDING. HOWARD SAYS THE TWO SUPERVISORS ARE OFTEN LAUGHING WHEN SHE PASSES BY TO EXIT THE BUILDING. THE WITNESS MILLER IS OFTEN PRESENT TO WITNESS THESE ENCOUNTERS. MILLER SAYS HE HAS CELL PHONE VIDEO. MILLER COLLABORATES HOWARD'S VERSION OF EVENTS.HOWARD SAYS THERE ARE NO RESTRAINING ORDERS IN PLACE. WHEN THIS SITUATION BEGAN OCCURRING, HOWARD SAYS SHE CONSULTED HER ATTORNEY. THE ATTORNEY TOLD HOWARD TO CONTACT THE SUPERVISOR ONE LEVEL HIGHER. HOWARD SAYS SHE DID CONTACT THAT NEXT LEVEL SUPERVISOR. HOWARD WAS INSTRUCTED BY THE NEXT LEVEL SUPERVISOR TO CALL SEATTLE PD TO REPORT THE HARASSMENT.

### VIII.    FIFTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RETALIATORY HARASSMENT DISCRIMINATION

31.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

32.    On January 12, 2016, Plaintiff was issued a Reprimand. The discipline was issued when on December 22, 2015, Talley and Brooks overheard Plaintiff, while exiting the building for the day and while in the midst of a private telephone conversation, laugh and make the comment: "Hilarious.com."  See attached Reprimand.

33.    Plaintiff responded to the formal discipline by explaining she was in a private conversation with a friend and her statement and laughter was unrelated to Talley and Brooks. The nature of the discipline demonstrates how Plaintiff was subjected to harassment by her supervisors for her every move, including her private communications outside of the work environment. On December 16, 2016, Ms. Howard testified about the ordeal at pp 29: "A. I was on my cell phone. I had already logged off for the day, I left the building, I went down the steps, and I was on my phone, and of course they're always outside following me. So I was on my phone talking to my fiancé and I started laughing and I said, "I'm already here," and we're basically make sure because he was late coming to pick me up, and he likes to be on time because of all of the issues I have at this job. So he said, "I'm on my way, I'm on my way. I almost hit a pedestrian." And we were just joking and I started laughing all I did was laugh, and Michael Brooks and Talley walked past me and I'm laughing. And once I started laughing, my fiancé pulled up and I got in the car and left. Then about a week ago a week after that incident, Kathryn Talley tells me, "Shaundra, can you come to my office and pick up some documents?" I said, "What documents do you want me to pick up? Just put it in my mailbox and I'll pick it up." She says, "No. I need you to come pick up the documents." I said, "Well, what are the documents?" And I kept asking her what the documents are. She said, "Oh, it's nothing. Just come pick it up." And this is all via email, it's not on the phone, it's back forth on email. And I said, "What is it about? Should I bring someone with me or a union rep? What are the documents? Are these work documents? If its work documents, just put it my box." She said, "No, no, no, just come up and pick up these documents. I just need you to pick them up." So I said okay. And I was very apprehensive about going into her office because I don't like being around this person at all, I try to avoid her at all times. So I waited, I contacted Steve Kofahl, and he said, "If it's just work documents, Shaundra, you have to go and pick them up." And I said okay. I was real anxious about it, but okay, I'll just go and pick them up. And once I came in, she's sitting there and she's like laughing and she said, "Here," and she pushed these papers at me. And I said, "what is this?" And I pick it up and it's an official letter of reprimand. And she stated that because I was laughing on my cell phone when I passed her a block away from the building, she felt that the laughing was towards her. And I'm reading this and I said I was shocked

11

because I'm thinking to myself, like, how do I get an official letter of reprimand when I'm off work, I'm on my personal cell phone a block away from the building. And she said, "There you go. You can signed it if you want to." And she turns around and starts laughing and gets on her computer. And I'm sitting there and I'm looking at this piece of paperwork. I go to Susan Banks and I said, "Susan, I just got an official letter of reprimand for being off the clock a block away from the building on my cell phone on a personal phone call, yet when I asked you about them, both Michael Brooks and Kathryn Talley harassing me, following me outside the building in the same area that I was laughing on my phone, you told me that there was nothing SSA can do and that it was outside of SSA space, there was nothing I can do and that I would need to contact law enforcement. So why is it that Kathryn Talley can write up an official letter of reprimand and have this in my personnel file, a letter of discipline regarding me laughing on my cell phone?" Susan Banks told me, "There's nothing I can do about it. If you want to challenge it, you know the rules, you need to contact your union representative and file a report against it." See also Decl. Shaundra Howard and Decl. Cedric Miller.

## IX.    SIXTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RETALIATORY HARASSMENT DISCRIMINATION

34.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

35.    On April 10, 2014, Plaintiff's co-worker in a wheelchair quickly lunged back in Plaintiff's pathway, striking "Plaintiff and almost causing Plaintiff to fall over and bruising her knee.

36.    Plaintiff has experienced harassment by coworkers for years. The harassment has included denigrating statements about her race, gender and person. Supervisor Talley failed to take any action to discipline employees who were involved in the conduct. Ms. Howard timely reported that she was the victim of the wheelchair lunging into her pathway. Whether it was intentional or not, it is clear Ms. Talley failed to take the incident seriously. She giggled and jokingly stated while giggling, "are you okay?" This is not the appropriate behavior of a supervisor who has reprimanded Ms. Howard for laughing while on a private telephone call. See claims 4 and 5 above and Exhibits 30-32.

12

## X.  SEVENTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983
### ---RETALIATORY HARASSMENT DISCRIMINATION

**37.**    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

38.    On February 10, 2014, a fellow employee ran into Plaintiff, pushing Plaintiff into the cubicle wall. Ms. Howard was walking into her cubicle office area and Ms. Danek was walking down the walkway. She states that she stopped so that Ms. Danek could pass her, but Ms. Danek intentionally ran into Ms. Howard with her shoulder, pushing Plaintiff into the cubicle wall. The assault was reported to Ms. Banks. Danek first claims it did not happen, but that she walked by Plaintiff's station, but never ran into her at all. See Exhibit 12. Danek later states she was recovering from a knee replacement and the day in question was one of the first days she did not have a cane. Ms. Howard did not create the event out of her imagination. Ms. Danek later admits it happened and she admits she did not ask Plaintiff to excuse her. She then claims it was Ms. Howard's fault. (Exhibit 16).

## XI. EIGTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983
### ---RETALIATORY HARASSMENT DISCRIMINATION

39.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

40.    On March 17, 2014, Plaintiff's co-worker deliberately went through Plaintiff's papers at the copier, "causing all items to be unorganized." Ms. Kline, Ron Devore was the one who first began referring to Ms. Howard as "CB" and as a "crazy bitch." See Kline Dep at pp 16-19. However, Devore denies ever using the term; he claims Kline was the first to use the term with Chris Odom. See Devore Dep at pp 18-27[1]. Devore also denies causing photocopies to be unorganized. However, was caught going through Ms.

[1] Plaintiff testified she heard the use of "Crazy Bitch," "Crazy Black Bitch," "CB" and "CBB" used by Devore, Kline, Odom, Danek, Donna Skubina, Audrey Roberts and others. See Kline Dep at pp 19-21 and Exhibit 10. Plaintiff is female, African American and Devore was named in Plaintiff's prior EEO complaint. A cardboard box was left in an open area within the office for all to see with the words: "Shaundra is crap." See ROI at pp 168-170, Exhibit 10.

Howard's copies and taking them out of order. Ms. Howard timely reported to management the event. After she caught Devore in the act, he then walked away and laughed. She states that she complained to Ms. Talley and Ms. Banks, with no response. (Exhibit 10). When reading Mr. Devore's response to this allegation in his deposition, it is clear he is not being forthright. See pp 27-32 and Exhibit 12.

### XII. NINTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---RETALIATORY HARASSMENT DISCRIMINATION

41.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

42.    On April 24, 2014, Plaintiff's leave request "for EEO activity" was delayed until Plaintiff contacted her representative. Ms. Howard was denied leave for EEO activity. She was forced to send an email to Ms. Talley regarding upcoming EEO activity. Talley argued back and forth with her regarding her request for leave. She states that it wasn't until she emailed her representative in regards to her request. Talley was fully aware that the EEO activity related to her conduct and she was going to do nothing to allow the leave if she could.  Exhibits 10, 33 and 41.  Talley states that she received an email from Plaintiff at 10:32 a.m. notifying her that Plaintiff needed 8 hours of EEO time for May 5th. By this time, Talley was fully aware of her obligations with respect to administrative time. She and her friend, Michael Brooks, had previously been the subject of EEO complaints by Howard. The intent of Ms. Talley was to interrogate Ms. Howard about the nature of the EEO complaint and to create as much confusion and consternation around the request as a form of retaliation.

43.    Ms. Howard testifies in her deposition at page 59: "A. I sent Kathryn Talley an email yesterday and let her know that I'll be in deposition and that I'm going to be gone for a certain amount of time. And her response was, "I need copy of the subpoena. What is it for? What other coworkers?" It's basically she was unsure of who what I was doing and why I was doing it, and she wanted a copy of the subpoena and said before I come back to work she wants a copy of the subpoena and the reason why I was in this deposition

today. Q. Now, when you go back to work this afternoon, she's expecting you to justify why you were gone; is that what I'm understanding? A. Yes. Q. All right. And how does that make you feel? A. Anxious...."

### XIII.    TENTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983
### ---RACIAL AND RETALIATORY HARASSMENT DISCRIMINATION

44.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

45.    On May 16, 2014, Plaintiff's co-worker commented, "I sure would like to know when this hearing is." When asked what hearing, she stated, "for CBB".

46.    Plaintiff states that she witnessed Ms. Danek make these comments. She states that Ms. Johnson also witnessed these comments. She states that Ms. Danek has made these comments before. (Exhibit 10) Ms. Talley states that she is not aware of this incident. (Exhibit 11); however, Ms. Banks states that she received a courtesy copy of an email regarding this incident from Ms. Talley. (Exhibit 12) Also see Exhibit 43. An email was also sent by Plaintiff on June 30, 2015, stating: "Jan Danek just approached Nabil Eskandar whose cubicle is next to me and states "So Nabil, when is your appointment about "HER today". Jan walks passed my cubicle and says, "she has everyone going to the Regional Office for that depositions crap." See ROI at pp 169.

### XIV.    ELEVENTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983
### ---RACIAL AND RETALIATORY HARASSMENT DISCRIMINATION

47.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

48.    Snickers candy bars have been placed on Plaintiff's keyboard as a form of racial jokes and insults. Ms. Howard has had these Snickers candy bars placed at her desk and when she returned from lunch or arrived in the morning, she would notice the candy bars and hear laughter from Nancy Kline and other coworkers.  The candy bars were used as a racial symbol or joke as part of an orchestrated plan to create a hostile work environment; the nature of the hostility is related to Ms. Howard, an African American

15

woman, who has brought a complaint for racial discrimination. The use of the candy bars as a racial symbol and joke is described and depicted on the internet as follows:

 See **Article I** Sniggers (a) From Uncyclopedia, the content-free encyclopedia Sniggers (original): *"Hey look! It's Sniggers!"* ~ "WHATEVER YOU DO DO NOT SAY THAT if you are white! Sniggers is a controversial spinoff of the popular candy bar Snickers. Unlike its popular counterpart, this one was targeted to black people albeit the offensive name pun. The candy bar has added nutrition to it and has several vitamins in it. Vitamin Z+ is the healthiest vitamin it contains because it makes people more athletic." Plaintiff has testified regarding how she was victimized with the placement of Snickers candy bars on her desk in her deposition of December 16, 2016: "Q. what were the claims that you filed in your prior EEO case? A. My prior EEO was harassment, racial discrimination, ongoing harassment with management as far as Michael Brooks, the name calling, the "crazy black bitch," and there was another name call they were calling me oh, and the Snicker bars, people were putting Snicker bars on my desk. Q. Snicker bars? A. Snicker bars. And that was a reference to niggers. So every day I would come into my work space, somebody would have a Snicker bar sitting on my desk. Q. Now, you say it's a reference to the word "nigger"? A. Correct. Q. Could you explain what you mean? A. I looked it up because I couldn't understand why somebody would continuing to put Snicker bars on my desk. And when I would come in, Nancy Kline, who would sit directly behind me, and Ron Devore, once I come into the office all I hear is laughter in the background. And I didn't understand who is leaving all these Snicker bars on my desk and everyone one starts laughing. The group Donna Skubina, Ron [Devore] and Nancy Kline -- they would start laughing. And I didn't understand why every day for almost several weeks I would receive candy bars, Snicker bars, small Snicker bars, large Snicker bars. And at one point I said this doesn't make any sense, something's it has to have a joke or something behind it, because every time I come in, I go on lunch break, come back, there's a Snicker bar sitting in my chair or on my keyboard right where I can see it. Q. How many times did this happen? A. This happened for weeks. And I reported it to Kathryn Talley, who was my supervisor at the time, and I reported it

to Susan Banks. And Kathryn Talley kind of made light of it saying, "What size was the candy bar? Was it a big candy bar? Was it a small candy bar?" She really made light of the situation. And I said, "Well, I already looked it up, I've already did my research on the whole Snicker bar, when somebody gives you a Snicker bar, and it has a racial reference behind it and it has to do with the word "nigger." And she said, "Well, I'll look into it." And that's the end of it, that's the last I've heard of it. And I continued to document every time somebody would leave a Snicker bar on my desk." No one from the agency has denied this occurred. The agency argues that it is unknown who has placed the Snickers bars on the Plaintiff's desk, so it is impossible to know if this is related to her prior allegations of harassment. The World Wide Web is used by American citizens every day. Snickers candy bars have been placed on Plaintiff's computer keyboard in secret three times during the several weeks leading up to her Motion to Amend. Snickers candy bars have a derogatory racial connotation, citing to a website called "Uncyclopedia, the content-free encyclopedia.[1]" The website states that Snickers has a "controversial spin-off' called "Sniggers," which can be used as an offensive pun or racial slur. This is how it was used against Ms. Howard. See Exhibit 10 and supplemental materials produced by Plaintiff during discovery. See Decl. Cedric Miller.

## XV. TWELVTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983 ---DESPERATE TREATMENT AND RETALIATORY HARASSMENT DISCRIMINATION

49.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

50.    From October 2013 to the the date Ms. Howard was constructively discharged and resigned her employment, she was forced to endure an unbearable workload and when she made requests for assistance, she was denied assistance. Ms. Howard testified in her deposition of December 16, 2016 about the workload harassment she endured from Michael Brooks and Kathryn Talley, who were close friends. At page 18: "I began to be harassed by Kathryn Talley, and that as when the switch became when Brooks no longer became my supervisor and Kathryn Talley became my supervisor. And once Kathryn Talley became my

---

[1] Some of the Snickers had the "S" covered up or redacted with the use of tape or a sharpie so that they read "nickers."

supervisor, I just began to have the whole emails of my workload go into my AU, which is Judge Araki, going to him, meeting with him, asking him what type of job I'm doing and trying to find anything on me so she can come back and email and say something to me about it. She would even send emails about workload issues that had nothing to do with me and tell know fix, or she would give me other coworkers in my group, she would give me their work. And I was already working with two judges and I kept telling her that I'm swamped, I can't do it. She says, "I'm directing you to finish this and give me a timeline. By the close of business today, I want this done. And if it's not done, I want the reason why it's not doing." So I had to put off what I was doing with my two judges that I was already trying to juggle and I had to finish their workload and I had to finish someone else's workload. And at the time, I asked Kathryn Talley, "Why, when I asked you when I have these two judges, when I ask you for assistance, you refuse, but you have me helping someone else in the group?" I'm directing you to do this and you need to do this by close of business!! And it was just sharp and direct. So once I finished someone else's workload, here is another email from Kathryn Talley saying, "Why aren't you finished with this workload with Judge Araki? Why haven't you done this?" And then my response would be, "Because you had me doing this other person's workload. I can't do all of this." Then her response was, "Well, you juggled two judges before." And then my response was, "That was before I was having to deal with mental health issues dealing with all this ongoing harassment. I'm in mental health counseling for PTSD dealing with all of the ongoing harassment that I have to deal with stress on the job," I said, "I'm not capable of handling two judges." And then her response, "Get it done." So I'm trying to juggle all of these and I'm still asking through this whole year, I was still asking her, every week, "Please, I need assistance can't do all of this work alone. I need assistance." And her response was, "No, get it done by close of business." ROI 177-192. See email exchange with Joshua Fahrnkopf at pages 541-556 of the ROI.

    51.    Talley, who was friends with Brooks, took up where Brooks left off. In November and December 2012, Plaintiff was accused of refusing to perform her assigned tasks and was yelled at by Michael Brooks, who acting as her supervisor. Brooks met with Administrative Law Judge to complain about Plaintiff's alleged performance shortcomings and Brooks began monitoring her work performance and

workplace conduct thereafter. See Talley Dep at pp 231-234 Evidence Related to Susan Banks' Failure to Terminate Harassment and Evidence Related to Additional Harassment.

52.    Ms. Howard explained how she was first supervised by Michael Brooks and then by Talley. The two supervisors were close.  At page 22 of her deposition, she explains the history: "Now, Ms. Howard, could you explain the circumstances where Ms. Talley became your supervisor? How was it that there was a change in supervision? A, I think it was having to do with my ongoing problems with Michael Brooks...I think the change was because of my ongoing harassment. And I continued to file complaint after complaint, and at that point I think Susan Banks said, okay, just let me go ahead and make the switch because of all of the ongoing complaints I continued to file against Michael Brooks. Q. Now during this entire time up through the last month or so when Ms. Banks retired, has Ms. Banks been your second line supervisor? A. Yes. MR. LANGKAMER: Objection. Q. And during that time, did you report what was going on with Ms. Talley and with Ms. Brooks to Ms. Banks? A. Yes. Q. And did Ms. Banks take any action to terminate the harassment and retaliation you're describing here today? MR. LANGKJ\NER: Objection, leading. A. No. Q. All right. Now, and I know that well, let me rephrase. Did you prepare emails, Ms. Howard, where you would send those to Ms. Banks asking for help? A. Yes." ROI 177-192. "Q. Did you ever receive any effort back [from Banks] explaining why she was going to either not take action or was going to take action?   MR. LANGKAMER: Objection, compound and leading. You can answer. A. After I would send her an email, I would wait. And when I didn't get a response, I would send another email asking her, "Did you receive my email? Are you going to do anything? This harassment is still ongoing. And then after a few days after the second email, she would tell me she would look into it and then that would be the end of it. Q. Now, I want to move to a different subject. After Ms. Talley came to become your supervisor, did you observe whether or not the relationship between she and Ms. Brooks continued, their friendship that you described earlier? A. Yes." See Talley Dep at pp 231-234 and Evidence Related to Susan Banks' Failure to Terminate Harassment.

## XVI. THIRTENTH CLAIM FOR RELIEF UNDER TITLE VII AND 42 USC 1983
## ---SEXUAL AND RETALIATORY HARASSMENT DISCRIMINATION

53.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

54.    Plaintiff was subjected to inappropriate touching by Administrative Judge Keith Allred and when Plaintiff reported it, Allred sought to intimidate Plaintiff by making additional statements and glaring at her while she sat in her cubicle and other times during the duty day.

55.    On July 28, 2016, Plaintiff wrote to Allred and demanded he not touch her again. The touching was along her shoulder and breast area: "Upon the start of the meeting (9:55am), as I was sitting in the meeting area (lunchroom) you came upon me and grabbed my left shoulder and rubbed it. You made me extremely uncomfortable and I felt it was very inappropriate. After you touched me, I told you, "please don't do that again", and you walked away. I have never met you, never conversed with you, yet I am aware that you're the Hearing Office Chief Administrative Law Judge (HOCALJ) Allred for the Seattle ODAR office. Regardless if I met you or not, do not touch me in that manner again. You made me feel extremely uncomfortable today and I do not want this to occur again." See Supplemental Materials at pp 67-72 of 598.

56.    An investigation was launched by the agency. The investigation precipitated a chain of events which included intimidation by Allred. This necessitated a second email from Howard. On September 16, 2016, Ms. Howard wrote the following email: "[At] 1023 am ALJ Allred just came into my work cubicle. As I am sitting in my cubicle, he walks over and begins to speak to my coworker and sits directly in front of me (Curt Marshall) and he (ALJ Allred) begins glaring at me. I left the area immediately and waited to make sure he had left my work area. I have filed my complaint regarding his inappropriate actions and stressed how very uncomfortable this person has caused me to feel in my already hostile work environment. In your investigation, I assumed that you spoke to this person and shared my concerns yet I am still the subject of ongoing harassment." See Supplemental Materials at pp 67-72 of 598 and Evidence Related to Sexual Harassment.

57.    Judge Allred was deposed on August 3, 2018. His testimony at page 52 is illuminating: "Q. Did Judge Rolph ever talk to you about any performance that might need to be corrected or changed? A. No.

Well, yes, he did. Q. What was that? A. Somewhere in the early months of my time there I got a complaint from an employee that I had touched her inappropriately, and I called him up and said, "Hey, I think I got a complaint today." And he said, "That's right. You should never touch anyone except to shake their hand." Q. Do you remember the name of that employee? A. Shaundra Howard. Q. Did she file an EEO charge, to your knowledge? A. She filed some kind of complaint. I don't know exactly what it was. Q. Do you know how that complaint was resolved? A. I don't think it's been resolved. Q. Still ongoing? A. To the best of my understanding. Q. So Ms. Howard made a complaint that you touched her inappropriately, and Judge Rolph counseled you to not ever touch another employee? A. Except to shake their hand. Q. Did Ms. Howard ever make any other complaints about you? A. She did. Q. And what were those? A. Well, there was a day a few months later, or several months later, whatever, when I was down on the fourth floor where she worked talking to one of the gentlemen who works down there. We were looking out the window and talking about road construction or the weather, or something like that. And I went back up to my office, and I was told later that she complained that I had gone into her workspace and glared at her or looked over her shoulder, or something like that. Q. Do you know how that complaint was resolved? A. I don't know. It was investigated and found not to be true, but whether it became part of a larger complaint or another separate complaint in a formal setting, I don't know." It turns out Allred was also accused of similar acts of sexual harassment by a female judge at ODAR office in Seattle. Like Ms. Howard, Allred touched other women inappropriately. Allred Dep at pp 52-77.

58.     Allred has had a long history of engaging in sexual harassment of women wherever he has been employed. See declaration of Shaundra Howard. The agency was on notice of this but failed to remove him from the work environment after Ms. Howard reported his conduct. Allred arrived in the Seattle office in April 2016. His harassment and discrimination created additional depression, anxiety and fearfulness for herself. Allred's harassment included inappropriate touching, glaring and subjecting her to second-guessing by those who should have taken action to protect her. Allred subjected Judge Ilene Sloan to similar attacks. Allred used his power as a supervising judge to pose a threat to Plaintiff. His actions aggravated her already

tenuous medical condition. See testimony of Allred at pages 48-58. Ms. Howard testified in painstaking detail how she became the target of retaliation after she reported Allred's conduct. Allred lashed out at her by coming near her cubicle and glaring at her and one point speaking loudly enough for her to hear that he was a supervising judge who could make things hard on anyone. The record reveals Allred used his power and authority against Ms. Howard and against Judge Ilene Sloan. Allred Dep at pp 52-77.

## XVII. REQUEST FOR RELIEF

59.     The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

60.     Plaintiff hereby asserts that her rights, which were secured by the Constitution or law of the United States, were violated and the alleged violations were committed by persons employed by the Social Security Administration.

61.     Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A.     compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.     economic losses on all claims allowed by law;

C.     special damages in an amount to be determined at trial;

D.     punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

E.     attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F.     pre- and post-judgment interest at the lawful rate; and,

G.     plaintiff seeks appropriate declaratory and injunctive relief pursuant to redress the Defendants above described ongoing deliberate indifference in policies, practices, habits, customs, usages, training and

supervision with respect to the rights described herein, and with respect to the ongoing policy and/or practice of Defendants in failing to properly investigate or appropriately handle complaints of the same, which Defendants have no intention for voluntarily correcting despite obvious need and requests for such correction.

H.      any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## XVIII. PLAINTIFF'S REQUESTS A TRIAL BY JURY

January 3, 2022

Respectfully submitted,

By: Shaundra Howard

SHAUNDRA HOWARD, acting *pro se*
13445 MLK JR WAY SOUTH, UNIT R202
SEATTLE, WA  98178
206-679-9550
shaundra_howard@msn.com

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that I caused to be served by facsimile the foregoing document to the following:

US District Court of Western Washington

January 3, 2022

Respectfully submitted,

By: Shaundra Howard

SHAUNDRA HOWARD, acting *pro se*
13445 MLK JR WAY SOUTH, UNIT R202
SEATTLE, WA  98178
206-679-9550
shaundra_howard@msn.com

23